UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VALERIE HERRERA,<br><br>　　　　　　　　　　　　*Plaintiff,*<br><br>　　　-against-<br><br>SYRACUSE UNIVERSITY AND THE SYRACUSE<br>UNIVERSITY SCHOOL OF ARCHITECTURE, and<br>MICHAEL A. SPEAKS, in his capacity as Dean of the Syracuse<br>University School of Architecture,<br><br>　　　　　　　　　　　　*Defendants.* | 5:24-cv-245 (AMN/ML)<br><br>**COMPLAINT and<br>JURY DEMAND** |

Plaintiff, Valerie Herrera ("Plaintiff" or "Ms. Herrera"), by and through her attorneys, Toporowski Law, PLLC, and Manning, Esq., complaining of Defendants, Syracuse University ("Syracuse University" or "SU"), the Syracuse University School of Architecture ("SOA") and Dean Michael A. Speaks, in his capacity as Dean of the Syracuse University School of Architecture ("Speaks"), alleges as follows:

**PRELIMINARY STATEMENT**

1.　　Plaintiff is a 38-year-old Latina female of Mexican American heritage.

2.　　Plaintiff was a foster care youth and lived in 13 homes as a foster care child before her 17th birthday.  She went to college nonetheless and excelled while always being true to her heritage. As a college student she delivered a speech on Hispanic mental health to a congressional caucus in Washington D.C. at the invitation of Congresswoman Grace Napolitano, and upon graduation she served as a spokesperson for the Orphan Foundation of America.

3.　　Defendant Syracuse University was founded in 1870 and has recently filed a 2021 Form 990 with the State of New York which demonstrates that SU received $1.89 billion in gross

receipts for 2021.  Its 2021 Form 990 states the mission of SU to be "…fostering a richly diverse and inclusive community of learning and opportunity."  Surely an institution with such massive resources and a real and legitimate commitment to diversity, equity, inclusivity, and the fostering of traditionally under-represented individuals would typically leap to action to support, retain, and advance an employee with Plaintiff's combination of diversity, identity, credentials, lived-experiences, and celebrated teaching results.  Tragically, as set forth herein, the Syracuse University School of Architecture appears to have chosen to abandon its mission with respect to Ms. Herrera – its only Latina professor.

4.     Ms. Herrera was and still is employed as a full-time Assistant Teaching Professor ("ATP") at SU in the SoA from 2019 to present and was a Part-Time Instructor from 2018-2019.

5.     As an ATP, each academic year Plaintiff teaches multiple required courses for the professional degree program in architecture.

6.     Throughout Plaintiff's employment at the SoA, she has been the victim of a hostile workplace environment, targeted racial discrimination, and retaliation as evidenced by multiple and varied acts of inequity, hostility, favoritism towards professors outside of her protected class, and undermining by Dean Speaks and his administration.

7.     This has resulted in Plaintiff being denied and/or passed-over for: (a) tenure-track positions; (b) design studio coordinator positions; (c) program director positions; (d) foreign program teaching positions; (e) professional workshop participation; (f) monetary research grants; (g) university teaching awards; and (h) any leadership position or participatory role in the SoA Diversity, Equity, Inclusion and Access Committee.

8.     Many of these aforementioned positions have been given to individuals who are Caucasian, male, or both.  Many of these individuals are at or below Plaintiff's rank, sometimes with

less teaching experience, and none of these positions have ever been held by a Latina, which is consistent with SU's and the SoA's continuous and pervasive suppression of Plaintiff's presence, identity, race, ethnicity, national origin, and role in the school.

9.      Plaintiff has never been provided a mentor or any formal mentorship of any kind and throughout her entire employment at Syracuse University the SoA has failed to provide Plaintiff with annual performance reviews as required by the SoA Faculty Bylaws.

10.     As a junior faculty member, a female, and a Latina who is regularly undermined by Dean Speaks and the associate dean, Plaintiff has suffered in ways that have impacted both her physical and mental health and has resulted in her taking an FMLA supported medical leave from August 29, 2022 – December 15, 2022.

11.     This complaint contains evidence of multiple incidents of discrimination, retaliation, suppression, dishonesty, sabotage, and violations of the SoA Faculty Bylaws, violations of the SU Faculty Manual, and violations of the SU Code of Ethical Conduct by Dean Speaks and the administration that he directs with the objective of discriminating against Ms. Herrera in a manner prohibited by Title VII and the Civil Rights law of the United States.

12.     Plaintiff's attempts to be hired on to the tenure-track have been met with resistance, misrepresentation, suppression, and accusations by SU and SoA's Dean Speaks.

13.     Syracuse University was the first school in the United States to offer a bachelor's degree in architecture and in the school's 150-year history, it has never hired a single Latina female as a tenure-track faculty member nor has the school ever tenured a Latina female.

14.     When Plaintiff asked Dean Speaks to be considered for tenure and other positions as someone who would promote diversity in accord with the SU mission statement, Plaintiff was scolded and told that she had to go through the normal search process and that she should not appear to

attempt to circumvent the normal process, though he had supported so-called "opportunity" hires for two male faculty members previously and was consistently supportive of white Caucasians opportunities.

15.     The SoA's leadership has regularly blocked Plaintiff from professional opportunities and access to employment positions within the school, has intentionally undermined Plaintiff to prevent her advancement, and has denied her positions and opportunities that have been afforded to a number of Plaintiff's similar ranking and lower ranking colleagues who are Caucasian.

16.     Dean Speaks and the associate dean have gaslighted Plaintiff, have bullied her and have created a palpable hostile work environment.

17.     Plaintiff has been lied to about positions and opportunities almost as a matter of procedure.  She has been defamed and undermined to her students and colleagues by Dean Speaks.

18.     The SoA has failed to construct a non-biased, non-discriminatory environment that celebrates diversity for Latinas.

19.     Plaintiff is the only full-time Latina faculty member in the SoA.

20.     Dean Speaks has lied to the Department Chair and has otherwise obstructed the Chair's attempt to support and advance Plaintiff through the Meredith Teaching Recognition Awards program because she is Latina.

21.     The school uses Plaintiff as a prop, as a lure for recruitment, for mentoring of graduate students, and for producing the image of diversity representation in their efforts to appear as if they are committed to diversity, equity, access, and equality while simultaneously working to prevent Plaintiff from opportunity, access, and equal treatment afforded to Plaintiff's colleagues.

22.     Plaintiff serves as the School's Faculty Advisor for NOMAS - the National Organization of Minority Architecture Students, a student selected position, but Plaintiff has had no

role in the SoA's diversity initiatives, including DEIA organization or programming.

23.     This is a lawsuit to vindicate Plaintiff Valeria Herrera's constitutional rights and to obtain compensation for the violation of her rights under federal and state law, and for the economic, reputational, emotional, and mental harm caused to her by Defendants Syracuse University and the Syracuse University School of Architecture.

## JURISDICTION AND VENUE

24.     This action arises under the United States Constitution, the New York State Constitution, and the common law of the State of New York.

25.     This action is brought pursuant to Title 42 U.S.C. § 2000, 1983, 29 U.S.C. §§ 215, 216 and under the Constitution and laws of the State of New York.

26.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202, 29 U.S.C. §§ 215, 216 and 42 U.S.C. § 2000(e)(5)(f).  The jurisdiction of this Court is invoked to secure the protection of and redress the deprivation of rights secured by the laws of the United States and of the State of New York providing for injunctive and other relief from discrimination on the basis of race and national origin and for violation of civil rights.

27.     Charges of discrimination have been filed with the Equal Employment Opportunity Commission pursuant to the provisions of Title VII of the Civil Rights Act of 1964.  The EEOC has issued a Right to Sue Notice to the Plaintiff.  This lawsuit is commenced within 90 days of the receipt of the Right to Sue Notice.

28.     All other perquisites of filing this lawsuit have been met.

29.     Plaintiff asserts claims under the NYSHRL for discrimination on account of race as well as retaliation for engaging in protected activity under the NYSHRL; namely, complaining about said racial discrimination.  Thus, the Court has jurisdiction with respect to these claims as well.

30.     The venue for this action is proper based on the fact that the events relevant to this action took place in this Federal District, and Defendants are located within or residents of the Federal District and Plaintiff resides in the Federal District.

31.     Venue is proper within the Northern District of New York. All of the events complained of occurred in Syracuse, New York, in Onondaga County, within the Northern District of New York.

32.     Defendants reside within the Northern District of New York.

33.     Plaintiff resides within the Northern District of New York.

**PARTIES**

34.     Plaintiff Valerie Herrera is, at all times relevant herein, a natural person residing in the Northern District of New York.

35.     Plaintiff Valerie Herrera is, at all times relevant herein, a citizen of the United States.

36.     Plaintiff Valerie Herrera is, at all times relevant herein, identifies as a Mexican-American or Latina.

37.     Plaintiff Valerie Herrera, at all times relevant herein, was employed by Defendants.

38.     Defendant Syracuse University was incorporated in New York State in 1870 as a non-profit corporation located in Syracuse, New York.

39.     Defendant Syracuse University is, at all times relevant herein, an employer within the meaning of the laws against employment discrimination.

40.     Defendant Syracuse University School of Architecture is, at all times relevant herein, an employer within the meaning of the laws against employment discrimination.

41.     Michael A. Speaks, at all times relevant herein, is employed by Defendants as Dean of the SoA and was acting within the scope of his employment and his duties in furtherance of his

employer's interests.

**FACTUAL ALLEGATIONS**

42.    The SoA has never, in its 150-year history, had a tenured female person of the Latin race or Mexican-American origin nor has it ever had a tenure-track female person of the Latin race or Mexican-American origin.

43.    Plaintiff was the only Latina, full-time, full-voting, full benefits eligible faculty member for tenure employed by Defendants in the SoA.

## A.  Obstruction of Teaching Award Nomination by Dean Speaks.

44.    Defendant Syracuse University is a large educational institution located in Syracuse, New York.

45.    In November of 2020, Undergraduate Chair Larry Davis wrote to Dean Speaks to nominate Plaintiff for a Meredith Teaching Recognition Award. His nomination was blocked and sabotaged by Dean Speaks who delayed his response to Davis for three weeks until the nomination period had expired, at which time he then misrepresented the criteria for nomination and the reason for not responding to Davis or otherwise supporting his effort to nominate Plaintiff for the award, claiming that the award that year was for 'online teaching specialist' [which would be a violation of the award's consistent annual basis for eligibility and evaluation].

46.    Davis had articulated in his letter to Speaks the importance of the SoA nominating a Latina for the first time.  The university award program coordinator confirmed that: "The Meredith Professors' Teaching Recognition Awards for Early Performance always have a diversity and inclusion component" and that it does not have a theme that changes from year to year. Dean Speaks ignored all of these factors in his obstruction of the Chair's attempt to nominate Plaintiff.

47.    Speaks has, however, nominated three white men for this award, two before and one after this event and after obstructing the Undergraduate Chair's attempt to address the diversity and inclusion component.

48.    Speaks did not nominate Plaintiff for a Meredith Teaching Recognition Award in 2021 nor did he nominate Plaintiff in 2022 which would support the assertion that his obstruction of Larry Davis' 2020 nomination of Plaintiff was an act of targeted discrimination and not because of a specific year award theme.

49.    No Latina from the SoA has ever been nominated for or awarded a Meredith Teaching Recognition Award.

**B.  SU Access Disabled by Dean Speak's Office.**

50.    On August 26, 2022, within two hours of the Dean's office being informed by HR that Plaintiff was approved for a 16 week medical leave beginning that day, the Dean's Office instructed the SoA Director of IT, Andrew Molloy, to immediately disable "all" of Plaintiff's access to all SU resources and communications including all email access, all HR links including Plaintiff's access to benefits pages, payroll pages, medical plan pages, tax records, all of Plaintiff's course teaching history, academic resources, library access, and all university provided software.

51.    Molloy expressed concern for the scale and scope of the sudden action given the aggressive nature of the total blackout but was again instructed, by the Dean's Office, to cut off all access immediately.

52.    The SoA has not taken the same action against any other SoA faculty member on medical leave. Upon Plaintiff initiating an inquiry as to the legality of this action by the dean and his administration, all access was restored, confirming the noncompliant overreach, and mean-spirited, spiteful, vindictive motivations by the dean in an effort to punish Plaintiff.

C. **Denial of Studio Coordinator Positions.**

53.     The Dean's Office has denied Plaintiff the opportunity to serve as a design studio coordinator for each of the twelve semesters that Plaintiff has been employed by SU.

54.     During this six-year period, multiple SoA-Bylaws-ineligible faculty members at Plaintiff's rank, some below her rank, some part-time and some with significantly less teaching experience than Plaintiff, often white, or male or both, have been invited to serve in these financially compensated studio coordinator positions in blatant violation of the SoA Bylaws and the anti-discrimination laws of the United States.

55.     Studio Co-coordinator positions are an important developmental experience for junior faculty and one that Plaintiff has been excluded from every opportunity, impeding her growth during important developmental years as a junior faculty member.

56.     The clandestine selection of faculty is done with a secretive 'tap on the shoulder' practice that is the central tactic of the SoA administration and one that broadly discriminates by denying Plaintiff's EEOC protected rights that require employers to provide 'access' and 'opportunity' to employment positions for protected class employees.

57.     Speaks has assigned very junior, by-laws ineligible, 'Part-Time Instructor' faculty to design studio coordinator positions on numerous occasions.

58.     Some very inexperienced part-time instructors have been handed design studio coordinator positions in their "first" semester at SU, and for some, in their first semester employed as a faculty member anywhere. One notable example is Part-Time Instructor Cait McCarthy who, for each of her first three semesters as a part-time instructor in the SoA, and with almost zero teaching experience, was assigned to serve as a design studio co-coordinator.  McCarthy was one year out of school, has never held a full-time position, has never taught her own design studio, and who is

Caucasian, was selected for three consecutive semesters, to co-coordinate studios and then later, asked to replace Plaintiff as the required drawing course instructor, though she had also never taught a drawing course.

59.     Plaintiff has never been asked to co-coordinate a design studio in her twelve semesters of teaching design studio in the SoA even though she is extremely well-qualified and by all accounts, a stellar teacher and professor.

60.     No Latina has ever served as a design studio coordinator for the SoA.

**D.  DEIA Compensation Inequity.**

61.     In March of 2022, Dean Speaks expressed his interest in Plaintiff serving as the next SoA DEIA Director.

62.     Dean Speaks did not meet with Plaintiff again until August of 2022 to formally address the position at which time asked Plaintiff to construct a blueprint-proposal for DEIA that Plaintiff would submit for his review.

63.     He also articulated a series of restrictive conditions - none of which were required for the former DEIA Director, Professor Lori Brown.

64.     Brown's position was multi-year without any term limit, she had absolute autonomy in determining programming, guest lectures, participants, schedule, agenda, and the issues that DEIA would and would not address.

65.     Speaks offered Plaintiff none of the programming support, none of the position longevity and none of the agenda autonomy provided to Brown.

66.     By meeting with Plaintiff two weeks before the start of the fall semester, Speaks restricted her ability to construct any meaningful fall programming, instead articulating "his" agenda and ultimately, control of DEIA and her potential directorship.

67.     Speaks limited Plaintiff's position to a single nine-month term that, at one point, he referred to as 'interim', which he later amended only after showing his true intent. Speaks then defined a framework that would limit Plaintiff's options for DEIA programming, participants, agenda, schedule and that created inequities in teaching load, service load, autonomy, and compensation.

68.     In addition, Speaks rejected the three fundamental agenda items Plaintiff defined as central to her submitted DEIA blueprint-proposal that he required.

69.     Dean Speaks also expressed his desire to construct a DEIA "vibe" - the insensitivity and opportunism of which insulted and horrified Plaintiff.

70.     Speaks, a white male, was clearly crafting a position that would not empower Plaintiff to do effective work on DEIA issues from the position of lived experience, but that would construct a favorable image for Speaks himself by working with the only brown, full-time, female faculty member in the SoA while simultaneously controlling the DEIA narrative. His actions were not in the spirit of any DEIA ambitions but rather, were precisely the byproduct and evidence of the kind of discrimination that instigated the need for DEIA initiatives in the first place.

71.     Most importantly, however, Speaks did not offer Plaintiff any course relief, even after she expressed serious concern for the increased workload considering her significant course responsibilities including teaching the largest required course in the SoA.

72.     In contrast, Speaks provided Professor Brown with 15 credit hours of course relief per academic year, reducing her normal 24 credit hour annual teaching load to 9 credit hours for each year that she served as DEIA Director.

73.     Based on a standard full professor's salary in the SoA, the value of compensation in course relief provided to Professor Brown is worth roughly between 50K – 80K annually.

74.     In comparison, Plaintiff was denied any course relief, required to teach her full 24

credit hour load, and lied to about a committee load reduction.

75.     In an act of racial discrimination by Speaks, the white faculty member directing DEIA was well-compensated with significant course relief and committee service load reduction, was allowed to define an agenda and construct a platform with complete autonomy and was supported in her programming and DEIA initiatives.  By constrast, as a Latina woman, Plaintiff was restricted in term limit, agenda, compensation, was used in an act of blatant tokenism, and treated as poorly compensated minority labor to serve the dean's ambitions.

76.     Dean Speaks was also adamant in his strongly expressed suggestion that Plaintiff not meet with Professor Brown until 'after' she had signed an agreement.

77.      Plaintiff immediately scheduled a meeting with Brown, who described her complete autonomy, compensation, course relief provided by Speaks and the unlimited term of her appointment. Brown recommended that Plaintiff decline the offer based on the inequities in autonomy, term length, compensation and the risks associated with directing DEIA as a non-tenure system employee.

78.     No Latina has ever served as the SoA DEIA Director.

79.     No Latina had ever been a member of the SoA DEIA Committee or of the SoA DEIA Council.

**E. Removal from Teaching Assignment and Replaced by Part-time Caucasian Professor.**

80.     In March of 2023, Associate Dean Kyle Miller recruited "Part-Time Instructor" Cait McCarthy – who had never taught a drawing course - to teach the ARC 181 required drawing course that Plaintiff had been assigned to teach for four years and that she was essentially hired to teach and for which she received a 3-0 Teaching Professor Evaluation Committee ("TPEC") unanimous positive teaching evaluation and formal recommendation for contract renewal.

81.     Almost immediately after being informed of Plaintiff's original February 2023 discrimination complaint to the Syracuse University  Office of Equal Opportunity, Inclusion and Conflict Resolution Services ("EIORS"), Dean Speaks and SU began to take action to undermine, discredit, and eliminate Plaintiff by replacing her with an under-qualified, part-time and inexperienced, Caucasian employee.  This was retaliation for Plaintiff's EEOC complaint.

82.     When McCarthy declined the teaching assignment, stating that she felt uncomfortable due to never having taught that content before, the SoA then 'hired' a new faculty member, Omar Ali, to the tenure-track, and assigned Ali to teach the hand drawing course, though his specialty was digital drawing – which is not the subject of the ARC 181 course.

83.     The SoA and Defendant Speaks then replaced Plaintiff with Ali and McCarthy then accused Plaintiff of lacking 'expertise'.  This was expertise that was unrelated to and outside of the course content and that was falsely manufactured by the SoA.   This was done by requiring Ali and McCArthy to teach digital content that is in clear violation of the course description and that contrast almost entirely, with the course content that Plaintiff accurately taught and for which she was celebrated for in the form of university online and newspaper media coverage, award nominations, TPEC unanimous supportive evaluation, and student course evaluations.

84.     The SoA began in March of 2023 to take deliberate steps to lay the foundation for the termination of Plaintiff and set up the entire series of events to construct the appearance of a justified termination of Plaintiff and her colleagues.

**F. Denied Standard Multi-Year Assistant Teaching Professor (ATP) Contracts.**

85.     By Syracuse University Faculty Manual definition, 'Teaching Professor' contracts are 'renewable', following a Faculty Manual required 'review' of teaching, and as such, teaching professor positions are not subject to being 'reapplied' for.

86.     Plaintiff asked for and was denied, on multiple occasions, a standard multi-year renewable assistant teaching professor contract consistent with university standards for her designation and rank.

87.     Plaintiff was offered instead, one-year assistant teaching professor contracts that had to be reapplied for each year.

88.     From 2016-2022 Dean Speaks and Associate Dean Czerniak were discriminatory in their decisions to give standard multi-year assistant teaching professor contracts only to certain select, dean-favorite assistant teaching professors, and then continuing or 'renewing' them, without conducting the required 'review' of teaching for these faculty.

89.     However, the SoA administration used the fact that the SoA had failed, for six years, to construct a required and compliant policy for the 'review of teaching' for ATPs, as the reason to not provide Plaintiff with a standard multi-year contract.

90.     Between 2018-2021, Plaintiff was lied to by Associate Dean Czerniak who claimed that these multi-year contracts 'do not exist' when in fact she had administered them for some dean supported ATP faculty.

91.     The dean and associate dean discriminated against Plaintiff by ignoring the 'teaching review' requirement for some faculty while using it as justification for not awarding standard contracts to Plaintiff.

**G. Denied Access and Opportunity to Apply for Florence Directorship.**

92.     In December of 2019 Plaintiff expressed interest, to Associate Dean Julia Czerniak, in serving as the Florence Program Director for the 2020-2021 academic year.

93.     Plaintiff was immediately dismissed by Czerniak who replied to her that,"…we are all set with this next appointment". This was months before the position would be officially filled but

Czerniak and Speaks had decided to exclude Plaintiff from consideration and to block her development and possible advancement by not considering her for this position.

94.     Plaintiff was not allowed to apply, to interview, to have her credentials reviewed or to be considered in the process of appointing the Florence Program Director.

95.     Czerniak and Speaks appointed Daniele Profetta, a non SoA faculty member and an employee at her same rank of assistant teaching professor, to the Florence Directorship, the fifth consecutive white male to serve in this position.

96.     In January of 2023, Plaintiff again informed the Associate Dean Kyle Miller of her interest in serving as the next Florence Program Director beginning with the Fall 2023 semester. Profetta's three-year contract-term ended in June of 2023 and the position again need to be filled.

97.     Associate Dean Kyle Miller replied to Plaintiff that Profetta will continue to serve as the Florence Program Director for 'the next years'.

98.     In reappointing Profetta, Defendants again violated the SoA Faculty bylaws and denied Plaintiff access to, and consideration for, the Florence Director position.  In May 2022 the SoA approved a new SoA Faculty Bylaw for the 'review' of ATP faculty – effective fall 2022. This review is required to take place in the fall of the faculty member's final year of their contract. For Profetta, that was the fall of 2022. With the same complete disregard for rules, procedures, bylaws, ethics and equity that they display as a matter of standard procedure, Miller and Speaks violated this SoA Faculty Bylaw requirement by not conducting the requisite 'review' of Profetta before announcing his reappointment.  Profetta has never gone through the required Teaching Professor Evaluation Committee [TPEC] review, however, the Plaintiff went through this TPEC review during the fall 2023 semester which resulted in a 3-0 positive TPEC vote supporting Plaintiff's teaching performance and an overwhelmingly supportive formal letter of evaluation unanimously recommending that Plaintiff

15

have her ATP contract renewed.

99.     No Latina has ever served as the SoA Florence Architecture Program Director.

**H. Denied Tenure-Track as an Opportunity Hire and or as a Spousal Hire.**

100.     In November of 2021, Dean Speaks denied Plaintiff's request to be hired on to the tenure-track as an 'Opportunity Hire' - a designation that allows the school to hire tenure-track faculty outside of the normal search process to address issues and opportunities relevant to the school, including diversity candidate hires and spousal hires – directing Plaintiff instead to go through the SoA faculty search process.

101.     In March of 2022 Dean Speaks again denied Plaintiff's request to join the tenure-track faculty as an Opportunity Hire, this time writing an accusatory and/or implicitly scolding email suggesting that Plaintiff was improperly attempting to circumvent the normal hiring process.

102.     Opportunity hires are, however, a normal and supported part of the university's hiring practice as evidence by the Syracuse University "Search Waiver Form" provided on the website of the Office of Faculty Affairs and by Dean Speaks having made opportunity hire exceptions on two separate occasions, both times hiring men who were able to bypass the normal search process and were hired on to the tenure-track without conducting a normal faculty search and without being told that they should not "appear to seek to circumvent the process."

103.     March 2, 2022 excerpt from email from Dean Speaks: "Valerie, Opportunity hires should be aligned with the school's faculty led hiring process and not seek or appear to seek to circumvent the process."

104.     The email from Dean Speaks was a dismissive, carefully accusatory, and dishonest communication meant to suppress Plaintiff, mislead her and block her professional advancement.

105.     The SoA, and the dean through a series of enthusiastic Instagram posts, is celebrating

its 150th year of existence and 150 years of never employing a Latina as a tenured or as a tenure-track member of the faculty of the SoA.

106.    No Latina has ever been appointed to the tenure-track in the SoA as a Diversity Opportunity Hire.

107.    No Latina has ever been appointed to the tenure-track in the SoA as a Spousal Opportunity Hire.

**I. Required to Perform Uncompensated Summer Labor.**

108.    Plaintiff is under contract each year from August 15 – May 15, but each summer she is asked to engage in a variety of activities, summer assignment preparations, welcome and recruitment events, etc.

109.    During Summer 2022, she was again asked to engage in work including meetings, assignments, presentations, etc. without compensation.

110.    Plaintiff felt pressured and intimidated to agree to work without pay even though she is not compensated nor is she an employee of the institution during these times. This is in violation of university policy as articulated in the Faculty Manual Section 2.12, Academic Year Appointment: The academic year begins one week prior to the first day of classes of the fall semester and ends with Commencement.

111.    Faculty Manual 2.12 excerpt: 'Typical faculty appointments are for this academic year period. Vacation periods for faculty members with academic year appointments are the summer break and the intercession periods occurring during the academic year. If the University chooses to use the services of faculty members in any time period or activities outside the academic year appointment, a separate appointment letter will be provided. Such contracts will specify the compensation for extra service, which may or may not be the academic year base salary rate.'

112.     Plaintiff has never been provided or offered any separate appointment letter for any period of any summer for which she has been asked to perform work of any kind for the SoA.

**J. Bias and Inequity in Distribution of Summer Research Grants.**

113.     In May of 2022 Dean Speaks announced a funding program for summer research grants.

114.     Approvable expenses for these grants included: "These grants are intended to support faculty summer research and can include proposals for equipment, summer research travel, manuscript preparation and photo research for book and journal projects, etc."

115.     Plaintiff submitted a proposal for a piece of equipment needed to produce work for a major exhibition that she had been invited to be included in as part of an international architecture drawing-design/publishing competition prize that she had won for Pamphlet Architecture during the Spring 2022 semester. The exhibition opening was scheduled for September 4th, the equipment would have been purchased before the June 30 deadline and used to produce the exhibition materials.

116.     Dean Speaks denied Plaintiff's funding request, giving manipulative, inaccurate, and dishonest reasons for rejecting her proposal.

117.     Yet Dean Speaks supported other grant applications that did not meet the manufactured criteria that he established for Plaintiff and that funded very generic requests for travel to see buildings and requests for new computers – all without defined research output, awards, publishing contracts, etc.

118.     "All" of the SoA faculty members who applied for this funding opportunity were approved for summer research grants by Dean Speaks – all except for two. Only Plaintiff's grant request for equipment for a prize-winning exhibition and her domestic partner's separate grant request for funding for image rights for a book project, were denied by Dean Speaks.

119.    Again, all SoA faculty who applied for funding were approved for funding except for Plaintiff and her domestic partner.

**K. Excluded from Participation in and Promotion of Professional Workshop.**

120.    In the Spring of 2021, Dean Speaks organized a major Drawing Workshop Series and Exhibition for the fall 2021 and spring 2022 semesters.

121.    Plaintiff teaches the largest required drawing course at Syracuse University, and her primary research, creative work, exhibitions, published essays, architectural explorations and commissioned works are all fundamentally, and usually explicitly based in the disciplines of drawing and printmaking.

122.    Plaintiff was, however, excluded by Dean Speaks, from either the organizing of, and more importantly, participation in this major professional drawing workshop series and exhibition in the SoA.

123.    Dean Speaks and then associate professor [now associate dean] Kyle Miller constructed the series during the spring and summer of 2021, contacting Plaintiff only at the end of the 2021 summer to ask if she would 'help out' with the logistics of the drawing workshop series.

124.    Plaintiff asked Speaks if she could be included as one of the participants, drawing being her area of expertise, research and teaching.

125.    Speaks denied her request and lied to her about the timing of the organization of the events, stating that it "came together very quickly", as an excuse for not including her in the workshops as a participant.

126.    One drawing workshop participant then was hired tenure-track, while Plaintiff was being denied that same tenure-track position.

127.    Speaks requested that Plaintiff 'assist' the actual drawing workshop participants

logistically as well as moderating two short discussions following their public lectures to facilitate the participants and the event's success.

128.    Though unsupported to participate, Plaintiff complied and did as requested.

129.    In a review of the current SoA website entries of 'past events', the Fall 2021 and following Spring 2022 Drawing Workshop series of events are all posted.

130.    Plaintiff moderated two of the post-lecture conversations of this series, however, her name never appears.  The events that she was asked to help with are not included on the website and Plaintiff is completely absent from the record of the workshop series.

131.    The rest of the faculty who participated in any capacity, are all recorded and or presented in some way on the SoA website either by name, image, content or a combination of these.

132.    Plaintiff is the only person who is entirely erased from this series of six events over two semesters.

133.    Plaintiff was lied to by Speaks, excluded from the series, and denied a professional development opportunity.

134.    Plaintiff was asked to help others and to facilitate their success which led to two of them acquiring employment positions that Plaintiff was an applicant for.

135.    Research universities like Defendants are positioned and expected to assist their fulltime faculty in supporting their research, especially when it relates directly to their teaching assignments at the university,  and by giving them opportunities to succeed and develop their work, profile, experience, etc.

136.    By denying Plaintiff a meaningful role, essentially a significant professional opportunity and platform in a major series of events that are precisely in her area of research and teaching expertise, is significantly more damaging in the context of a university where an older

Caucasian male administrator is undermining and blocking a junior faculty member, a woman, a Latina and a terminal contract employee, this while providing uneven support for his selected faculty favorites.

137.    In addition, Speaks told Plaintiff that she would be compensated for her assistance with the workshop. She was never compensated, credited, or identified in any way.

**L. Denied Equal Opportunity and Access to Apply for NYC Director Position.**

138.    No required faculty search was conducted for NYC Architecture Program Director position, though a new director was hired during the spring 2022 semester.

139.    The hiring of university faculty is governed by university policies, HR rules, and federally mandated equal employment opportunity requirements that are typically combined with an added commitment to issues of diversity, equity and inclusion in the composition of a faculty, or what is understood as the inclusive and diverse university community.

140.    Fundamentally, 'new faculty' cannot be hired without running a proper faculty search which includes announcing, advertising, and soliciting a diverse pool of qualified applicants for the specific position with schools being highly accountable for the specifics of the search advertisement's position description.

141.    In May 2022 the SoA hired a new New York City Architecture Program Director. This position was not announced or advertised, the job opening was not made public, Plaintiff was not made aware of the position being available nor did she have the opportunity to be considered for or to apply for this position. However, the NYC Program Director was hired from the same exact ATP applicant pool that the Plaintiff was an applicant in.  So, multiple people applied for ATP positions with no advertisement or 'job description' of the NYC Program position, and one Caucasian ATP applicant – with less employment longevity at SU - was discreetly given the NYC position  while

Plaintiff was not afforded consideration.

142.    Dean Speaks hired a new assistant teaching professor as the New York City Architecture Program Director, a position that Plaintiff would have been very interested in were she to have been made aware that the position was open and were she to have been allowed to apply for it.

143.    No Latina has ever served as the SoA New York City Program Director.

**M. Removed from Summer Employment Position.**

144.    During the 2013 summer, Plaintiff was employed as a 'Teaching Associate' in the SoA's Three Cities International Program.

145.    Plaintiff worked with her partner who is a tenured faculty member at Syracuse University who was serving as the Director of Florence Architecture Program and in addition, directing the Three Cities International Program.

146.    Upon being hired as dean, having never met Plaintiff or her partner, having never spoken in any capacity to either of them and having never visited the Florence or Three Cities Programs, one of Speaks' first acts was stop Plaintiff's future employment and disallow her from being employed as a Teaching Associate for both the Summer 2014 and Summer 2015 Three Cities programs.

147.    Speaks claimed that Plaintiff was not being allowed to be employed by the program because of what he claimed was a concern for the image of conflict of interest.  As Plaintiff was an employee of Syracuse university and not of her partner, there was no conflict of interest but this served as a handy excuse for Speaks to take employment away from her.

148.    Since 2002 there have been ten 'couples' who have had both partners employed by the SoA at the same time for some part of their employment at SU.

149.    Of the twenty individuals that comprised these ten couples, nineteen of them are Caucasian and one, Plaintiff, is Latina.

150.    While Plaintiff was removed from a very minor summer assistant role in a foreign program, no other faculty member was ever removed from any employment position due to a supposed concern for an appearance of a conflict of interest.

151.    Dean Speaks disingenuousness about the reason for stopping Plaintiff's employment became apparent over the next few years when he was demonstrably supportive of filling positions and even in inventing new teaching positions for partners of spouses of faculty/administrators.

152.    Speaks only did this, however, for Caucasian administrators with Caucasian partners.

153.    For approximately six continuous years, Speaks supported Graduate Program Chair Brian Lonsway in hiring his wife Kathleen Brandt (Ms. Brandt has no architectural degrees) to teach in the graduate program for the duration of his term as chair. Brandt would have to report to her husband, Lonsway.

154.    After appointing Assistant Professor David Shanks to the Florence Architecture Director position for the 2018-2020 term, Speaks then created a teaching position for Shanks' wife, Aurelie Frolet so that she could be employed by Syracuse University in the Florence Program during Shanks' term as Director. Frolet would have to report to her husband, Shanks.

155.    Upon appointing Julia Czerniak as Associate Dean, Dean Speaks and Czerniak together invented a new administrative position for Czerniak's husband, Mark Linder. Linder then served as the new Thesis Director, a position that the school and faculty did not approve. ~~or need.~~ eliminate

156.    The newly created position allowed Linder to be alleviated of normal teaching requirements and to receive an additional stipend for his role as Thesis Director. In this role, Linder

would have to report to his wife, the Associate Dean Czerniak.

157.    Plaintiff is the only one that was ever removed from an employment position because of what was claimed to be, an appearance of a conflict of interest – an ironic assertion for a dean who has built a school on a foundation of closed, clandestine, top down, authoritarian rule where favoritism, discrimination, hostility to protected race and gender classes, and conflicts of interest are the standard.

**N. Threatened Termination for Not Signing Contract.**

158.    During negotiations for Plaintiff's ATP position, she was directed by Associate Dean Czerniak to negotiate salary with Assistant Dean Freeney. She was then told by Freeney that salary negotiation was not possible and that there were no additional funds available for her salary.

159.    This conversation took place on a Friday, the final day of a two-week period that Plaintiff was given to sign her contract – no negotiations allowed.

160.    At 7:30 pm that Friday Plaintiff was told to sign the contract by midnight that same day or that the SoA would move on to new candidates.

161.    Defendants were aggressive and threatening. It was a deeply stressful situation as Plaintiff had to basically play a game of chicken with her employer and risk losing her job.

162.    Plaintiff felt threatened, intimidated and lied to which was confirmed by the fact that once she took the uncomfortable step of not complying with the midnight deadline, the SoA then did offer her a $2000 raise which confirmed that there was actually additional money available for salary, they just did not want to give it to her.

163.    The increase was transmitted to her during an aggressive Zoom conversation with Dean Speaks where he scolded her for the timing of her actions.

**O. Never Invited to Participate in DEIA Initiatives.**

164.     The SoA's Diversity, Equity, Inclusion, and Access [DEIA] initiatives were led by the DEIA Director, Professor Lori Brown.

165.     In Plaintiff's four years at SU, she has not been invited to participate in any DEIA events, programming, leadership, etc. and have effectively been excluded from any DEIA involvement under the leadership of Dean Speaks.

166.     Plaintiff has never been included or invited to participate in any DEIA events, meetings, programming, lectures, etc.

167.     Most notably, while Plaintiff was the only full-time Latina on the SoA faculty, she has never been asked to participate or collaborate in any way in DEIA events including those for Latin and Hispanic Heritage Month.

**P. Administrative Appointments Announced without Advancement of Plaintiff.**

168.     In the spring of 2022 Dean Speaks issued a formal public statement announcing the six new administrative appointments that he had made in the SoA. These are all compensated administrative appointments that are filled unilaterally by the dean. This is done without formally informing the faculty of the positions being open, without inviting faculty to express interest in any of the positions, without inviting applications, letters of interest, or a submission of credentials for the positions.

169.     With unchecked and absolute authority, Speaks appointed six Caucasian individuals to six different SoA administrative positions.

170.     In an act of discrimination that is consistent with how Dean Speaks has treated Plaintiff throughout her employment, she was not given the opportunity to be considered for any of these positions, some of which Plaintiff would have been very interested in.

171.    No Latina has ever been appointed to the positions of Associate Dean, Graduate Chair, London Program Director, NYC Program Director, Thesis Director, or Associate Dean of Research.

172.    Defendants' unlawful discriminatory actions were a continuing course of conduct and have continued up and until the filing of the instant action.

### First Cause of Action
### (U.S. Constitution – 14th Amendment – Equal Protection)

173.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

174.    Defendants acted with discriminatory intent.

175.    Plaintiff is a member of a protected class as a woman of color and as a Latina.

176.    Plaintiff was qualified for the opportunities and advancements she sought.

177.    Plaintiff has suffered numerous adverse employment actions by Defendants.

178.    Defendants, individually and in concert with each other, violated Plaintiff's rights protected by the 14th amendment to the U.S. Constitution to equal protection of the law and are liable to her for the injuries caused by said actions.

### Second Cause of Action
### (Title VII Discrimination)

179.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

180.    Title VII of the Civil Rights Act of 1964 guarantees employees protection against discrimination on the basis of race, sex and national origin in employment and guarantees that

employees shall not be subjected to retaliation for complaining of discrimination and/or assisting in any way with an employment discrimination claim.  Title VII's prohibitions include, for example, prohibitions against the denial of advancement on the basis of race, sex or national origin and the denial of equal pay for equal work, and/or comparable pay for comparable worth.

181.    Because of the Defendants' actions, Plaintiff has been and is being subjected to denial of equal employment opportunities, including, denial of advancement on the basis of race, sex and national origin and she is being retaliated against in violation of Title VII.

182.    Defendants' conduct created, condoned, ratified and acquiesced to a hostile work environment on account of Plaintiff's sex, race, and national origin.

183.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including but not limited to monetary and/or other economic harm.

184.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

185.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under Title VII.

186.    Because of the Defendants' actions, Plaintiff has been damaged and injured in the sum of $1,200,000.00.

**Third Cause of Action**
**(Retaliation in Violation of Title VII)**

27

187.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

188.     By the actions described above, among others, Defendants retaliated against Plaintiff for engaging in protected activity under Title VII.

189.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including but not limited to monetary and/or other economic harm.

190.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

191.     Defendants' unlawful and retaliatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under Title VII.

### Fourth Cause of Action
**(NYS Constitution, Art. I, Section 11 – Equal Protection)**

192.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

193.     Defendants, individually and in concert with each other violated Plaintiff's rights protected by Art. I, section 11, of the NY Constitution to equal protection of the law and are liable to her for the injuries caused by said actions.

### Fifth Cause of Action
**(Violation of NYSHRL)**

194.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

195.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her sex, race and national origin in violation of NYSHRL.

196.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including but not limited to monetary and/or other economic harm.

197.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of NYSHRL, Plaintiff has suffered and continues to suffer, injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

198.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under NYSHRL.

<u>**Sixth Cause of Action**</u>
**(Hostile Work Environment)**

199.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

200.    The workplace was permeated with discriminatory intimidation, ridicule and insult as a result of Defendants' conduct such that it altered the conditions of Plaintiff's employment and created an abusive working environment.

201.    The hostile work environment that Plaintiff faced affected her ability to do her job and, of course, once Plaintiff reported the unlawful conduct she was retaliated against and terms, conditions and privileges of her job were affected.

202.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

203.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief in an amount not less than $2,000,000.00.

**Seventh Cause of Action**
**(Retaliation in Violation of the NYSHRL)**

204.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

205.    By the actions described above, among others, Defendants retaliated against Plaintiff for engaging in protected activity in violation of NYSHRL.

206.    Plaintiff engaged in protected activity by repeatedly complaining to her assigned supervisors, among others, about the unlawful discrimination she faced.

207.    Defendants were aware of the protected activity that Plaintiff engaged in.

208.    Defendants retaliated against Plaintiff on the basis of her protected status in violation of the NYSHRL after she complained of the discrimination.

209.    Defendants retaliated against Plaintiff by stripping her of her job duties and responsibilities.

210.    They further retaliated against her by denying her opportunities and advancement.

211.    Plaintiff suffered materially adverse actions engaged in by Defendants.

212.    A causal connection exists between the protection actions that Plaintiff engaged in and the discriminatory actions that Defendants took against Plaintiff.

213.    Defendants' retaliatory tactics were reasonably likely to deter a person from engaging in protective activity, such as complaining about discrimination

214.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including but not limited to monetary and/or other economic harm.

215.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

216.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under NYSHRL.

217.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief in an amount not less than $2,000,000.00.

### Eighth Cause of Action
**(Retaliation in Violation of the Family and Medical Leave Act "FMLA")**

218.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

219.   By the actions described above, among others, Defendants retaliated against Plaintiff for engaging in protected activity in violation of the FMLA.

220.   Plaintiff engaged in protected activity by taking medical leave.

221.   Defendants were aware of the protected activity that Plaintiff engaged in.

222.   Defendants retaliated against Plaintiff on the basis of her protected status in violation of the FMLA while she was taking medical leave.

223.   Defendants retaliated against Plaintiff by stripping her of her job duties and responsibilities and turning off her access to computer systems, *inter alia*.

224.   They further retaliated against her by denying her opportunities and advancement.

225.   Plaintiff suffered materially adverse actions engaged in by Defendants.

226.   A causal connection exists between the protection actions that Plaintiff engaged in and the actions that Defendants took against Plaintiff.

227.   Defendants' retaliatory tactics were reasonably likely to deter a person from engaging in protective activity, such as taking family and medical leave.

228.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law, including but not limited to monetary and/or other economic harm.

229.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of FMLA, Plaintiff has suffered, and continues to suffer injury, pain, ailments and conditions,

and reputational harm, as well as mental anguish and emotional distress, for which she is entitled to an award of compensatory damages.

230.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under the FMLA.

231.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief in an amount not less than $1,000,000.00.

**WHEREFORE,** Plaintiff prays that the Court enters judgment in her favor in a sum in excess of the monetary jurisdiction of all lower courts which would otherwise have jurisdiction over this action to be determined at trial against the Defendants for the following relief:

    A.  An award of economic damages;

    B.  An award of compensatory damages;

    C.  An award of punitive damages;

    D.  Prejudgment interest on all amounts due;

    E.  An award of reasonable attorney's fees and costs; and

    F.  Such other and further relief the Court deems just and proper.

### <u>Jury Demand</u>

Plaintiff respectfully demands a trial by jury on each and every issue of the Complaint.

Dated:  February 20, 2024
       Albany, New York

                         **TOPOROWSKI LAW, PLLC**

                         By: _____

                              Matthew A. Toporowski, Esq.
                         *Attorneys for Plaintiff Valerie Herrera*
                         P.O. Box 7271
                         Albany, New York 12224
                         Tel: (845) 532-3513
                         matthew.toporowski@gmail.com

                         **MANNING, ESQ.**

                         By: _____

                              Jeremiah F. Manning, Esq.
                         *Attorneys for Plaintiff Valerie Herrera*
                         49 Oldox Road
                         Delmar, NY 12054
                         Tel: (518) 334-2652
                         jfm@manningesq.com